**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

M. R.; S. J.; C. B.; D. W.; A. B.;
M. B.; AN. B.; J. B.; K. S.; T. M.;
A. R.; M. J. B.; J. H.; H. C.; THE
ARC OF WASHINGTON; SERVICE
EMPLOYEES INTERNATIONAL UNION
HEALTHCARE 775NW; PUGET SOUND
ALLIANCE FOR RETIRED AMERICANS,
　　　　　*Plaintiffs-Appellants,*

　　　　　　v.

SUSAN DREYFUS, in her
professional capacity as Secretary
of Washington State Department
of Social and Health Services;
WASHINGTON STATE DEPARTMENT OF
SOCIAL AND HEALTH SERVICES, a
Department of the State of
Washington,
　　　　　*Defendants-Appellees.*

No. 11-35026

D.C. No.
2:10-cv-02052-TSZ

ORDER
AMENDING
OPINION AND
DENYING
REHEARING AND
AMENDED
OPINION

Appeal from the United States District Court
for the Western District of Washington
Thomas S. Zilly, Senior District Judge, Presiding

Argued and Submitted
June 9, 2011—Seattle, Washington

Filed December 16, 2011
Amended June 18, 2012

Before: Stephen Reinhardt, William A. Fletcher, and
Johnnie B. Rawlinson, Circuit Judges.

6957

Order;
Dissent to Order by Judge Bea;
Opinion by Judge William A. Fletcher;
Dissent to Opinion by Judge Rawlinson

**COUNSEL**

Stephen P. Berzon. Eve Hedy Cervantez, Stacey Leyton, Matthew John Murray, Casey Austin Roberts, ALSHULER BERZON LLP, San Francisco, California, Andrea Brenneke, MACDONALD HOAGUE & BAYLESS, Seattle, Washington, for the appellants.

Edward J. Dee, William T. Stephens, William Bruce Work, OFFICE OF THE WASHINGTON ATTORNEY GENERAL, Olympia, Washington, for the appellees.

---

## ORDER

The opinion filed December 16, 2011, and published at 663 F.3d 1100, is amended as follows:

On page 1107, right column, lines 16-19: delete <The district court stayed proceedings, including disposition of the motion for class certification, pending our decision.>

On page 1121, left column, line 10: change <obviously> to <likely>

On page 1121, left column, lines 17-19: change <The district court stayed its decision on class certification pending our ruling on appeal.> to <At the time we reviewed this appeal, the district court had yet to rule on Plaintiffs' motion for class certification.>

With these amendments, Judges Reinhardt and W. Fletcher have voted to deny Plaintiffs-Appellants' petition for rehearing and Defendants-Appellees' petition for rehearing and petition for rehearing en banc. Judge Rawlinson has voted to deny Plaintiff-Appellants' petition for rehearing and to grant Defendants-Appellees' petition for rehearing and petition for rehearing en banc.

A judge of the court called for a vote on the petition for rehearing en banc. A vote was taken, and a majority of the active judges of the court failed to vote for en banc rehearing. Fed. R. App. P. 35(f).

The petitions for rehearing and the petition for rehearing en banc are DENIED. No further petitions for rehearing or for

rehearing en banc may be filed. The mandate shall be issued forthwith.

---

BEA, Circuit Judge, joined by KOZINSKI, Chief Judge, and O'SCANNLAIN, TALLMAN, RAWLINSON, BYBEE, CALLAHAN, IKUTA, and N.R. SMITH, Circuit Judges, dissenting from denial of rehearing en banc:

This case is one of several recently brought requesting an injunction to block across-the-board decreases in expenditures for social services, enacted to eliminate a state's budgetary deficits. This, despite the fact that the rate reductions were validly adopted by agency regulation, and despite a state law requirement to prevent deficits in accounts. This, in the name of preventing "discrimination" against disabled persons under the Americans with Disabilities Act ("ADA"). Yet the panel majority sided with the plaintiffs and reversed the denial of a requested preliminary injunction.

Mind you, this case does not involve the provision of certain social services to one group of disabled—those in nursing homes—but not to another group—the disabled residing at their own homes. No, the panel majority's decision proceeds on the premise that the very reduction of social services currently provided the at-home disabled will risk their going to nursing homes, and that such reduction therefore "discriminates" against the at-home disabled, although not in favor of the disabled in nursing homes, or anyone else. But virtually everything the government does involves discrimination; it is in the nature of laws that they treat some people differently from others. This is not generally impermissible discrimination. Most government spending affects some groups more than others, but that doesn't mean that the result is impermissible discrimination.

The Supreme Court tells us that discrimination against the disabled may occur when certain social services a state actu-

ally provides are found only at nursing homes, and not provided at-home. Then the risk arises that the at-home disabled must enter nursing homes, rather than remain at-home. *That is discrimination under the ADA. See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999).

As noted, a divided panel of our court reversed the denial of a requested preliminary injunction to block the reductions here. This decision has the immediate effect of blocking the reductions of services for only the twelve named plaintiffs. But since the decision interprets and applies the ADA, it constitutes binding precedent in our nine Western states, with 20% of the nation's population.[1]

We should have taken this case en banc. The panel majority's opinion fits the criteria of Federal Rule of Appellate Procedure 35(a) to a tee. The panel majority's opinion conflicts with precedent of the Supreme Court,[2] our court,[3] and the Second Circuit.[4] It is also a case of exceptional importance. It involves nothing less than the ability of a state to reduce the amount of its totally voluntary and optional Medicaid social welfare expenditures to balance its budget. No doubt that is why California joined Washington to urge us to review the case en banc. The issue is whether state budgetary decisions

---

[1]In *Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012) (en banc), our en banc court recently clarified that *all* published opinions—including those interpreting statutory law at the preliminary injunction stage, as occurred in that case—constitute "law of the circuit," such that they "constitute[ ] binding authority which must be followed unless and until overruled by a body competent to do so." *Id.* at __ n.4 (internal quotation marks omitted).

[2]*Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999). *See infra* pp. 6970-74.

[3]*Townsend v. Quasim*, 328 F.3d 511 (9th Cir. 2003). *See infra* pp. 6974-75.

[4]*Rodriguez v. City of New York*, 197 F.3d 611 (2d Cir. 1999). *See infra* pp. 6976-77.

will be replaced by those of our colleagues, federal appellate judges, by use of a strained interpretation of the ADA.

## I.  Background

*1.  The program at issue.* Washington has voluntarily elected to pay for "personal care services," such as feeding, medication management, cooking, and other "physical or verbal assistance with activities of daily living" to certain disabled individuals under its state Medicaid program. *See* Wash. Rev. Code § 74.39A.009(18). Approximately 45,000 disabled individuals receive personal care services. *M.R. v. Dreyfus*, 663 F.3d 1100, 1104 (9th Cir. 2011). Some of the providers of personal care services are professionals, but others are family members who take care of their disabled relatives, at state expense. Washington's receipt of federal Medicaid money for other medical services in no way depends on its provision of these "personal care services."

Washington devised an individualized assessment system called CARE to determine the number of hours for each aid recipient. *Id.* Under CARE, "the individual [recipient] is scored on factors such as an individual's ability to perform daily activities and an individual's mental status," and is then assigned to one of 17 groups. *Id.* (quoting *Samantha A. v. Dep't of Soc. & Health Servs.*, 256 P.3d 1138, 1140 (Wash. 2011) (en banc)). In 2010, before the proposed cuts, the most needy group received 416 hours of personal care assistance per month (nearly 14 hours a day, 30 days per month), and the least needy group received 26 hours per month. D. Ct. Order 6.

It is critical to understand, as the district court found and the panel majority's opinion does not dispute, that although CARE is an individualized assessment based on needs, it is not a guarantee of a minimum level of care needed to keep an individual at home or outpatient locations, rather than in a nursing home. D. Ct. Order 13. To the contrary, the program

is a flexible one: coverage is dependent in part on how much money the state has.

Washington has used this flexibility to change its payout for personal care service hours a number of times in the last ten years. From 2004 to 2006, the number of hours paid for was on average approximately the same as now, after the most recent (late 2010) cuts.[5] When the economy and the collections rose, from 2007-2009, the paid hours allotment increased. Following the recent recession, the state reduced base hours by an average of about 4%; but in early 2010, the state restored those 2009 cuts. Finally, because of the state's last budget crisis and an executive order of late 2010, the State made the approximately 10% average cuts, which brought the state back down to 2004 to 2006 levels of payments for hours provided. *See generally* D. Ct. Order 7. Though the number of hours provided has fluctuated, the record shows that Washington has shown consistent success in accomplishing the goal of the integration mandate: keeping the disabled in the community. In every year since 1992, the number of disabled persons in Washington who receive community-based care has increased, while the number of persons who receive nursing home care has decreased. *See* Exhibit Below.

---

[5]As explained below, under the panel majority's reasoning, even the 2004 to 2006 hours allotment would violate the ADA.



People receiving care in community-based versus nursing home settings,
Washington, 1992-2008.
*Source:* Washington State Dep't of Social and Health Services, *Fact Sheet: A Successful Vision*
(entered into evidence in district court).

Two other features of the program must be kept in mind. The first is called the "Exception to the Rule," or ETR, process. As the panel majority mentioned, a beneficiary who disputes that his allotted hours are adequate for his needs may request an increase in payment for hours of personal services. *M.R.*, 663 F.3d at 1105. What the panel majority does not mention is that the state approved 89% of the ETR requests for additional hours in 2010. D. Ct. Order 7.

Second, Washington's program is extraordinarily generous. Even after the proposed cuts, Washington pays for up to 393 hours per month for an individual. Of course, even more paid hours are possible through the ETR process. D. Ct. Order 6, Table 1. By contrast, the maximum number of personal care hours authorized in California is 283 per month. Cal. Welf. & Inst. Code § 12303.4(b).

*2. The proposed cuts.* Washington, like many states, faced a severe budget crisis in 2010. On September 13, 2010,

Governor Gregoire issued an executive order requiring across-the-board budget cuts because "the national economic downturn" caused "revenues [that] have fallen short of projections," and the state's general fund was in danger of running a deficit.[6] 663 F.3d at 1105. The Department of Social and Health Services adopted a regulation which cut the base hours of CARE recipients, with cuts ranging from 6.3% for those receiving many hours to 18.8% for those receiving fewer. The variation in cuts is based on "the notion that the individuals currently receiving only a handful of personal care service hours per month are the most independent and therefore the least likely to require nursing home care." D. Ct. Order 8 n.7. Even after the cuts, anyone may still request an ETR to adjust hours upward.[7] WAC 388-440-0001.

*3. This lawsuit.* The plaintiffs are disabled and elderly individuals who receive in-home personal care services through the voluntary "personal services" feature of Washington's Medicaid program. They are currently proceeding individually, and a motion for class certification was recently stricken without prejudice to its being refiled following the issuance of

---

[6]As the panel majority opinion acknowledges, Washington law requires that "[i]f at any time during the fiscal period the governor projects a cash deficit in a particular fund or account . . . the governor shall make across-the-board reductions in allotments for that particular fund or account so as to prevent a cash deficit." 663 F.3d at 1105 (citing Wash. Rev. Code § 43.88.110(7)).

[7]As of the time of the district court's order, at least one of the original named plaintiffs had already received additional hours through the ETR process, and this adjustment actually *increased* his hours over those hours he received before the cuts. Two others who requested ETRs will instead receive a re-assessment of their base CARE classification level. They are likely to be placed into a higher CARE group, and so will probably be entitled to more hours than their previous allotment following the across-the-board reduction. Five of the named plaintiffs applied for and were denied extra hours when the state committee determined that the plaintiffs did not require more hours to preserve their health and safety.

this court's mandate. *See* Proposed Order Amending Opinion at 2.[8]

As relevant here, the plaintiffs allege that the state's reduction violates the general non-discrimination provision of the ADA, which provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. An implementing regulation, called the "integration mandate" provides that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."[9] 28 C.F.R. § 35.130(d). The plaintiffs contend that the state's reductions in paid hours for "personal services" violate the ADA because "the reduction in hours will substantially increase the risk that they will be institutionalized in order to receive care adequate to maintain their mental and physical health." *M.R.*, 663 F.3d at 1102.

The district court held over five hours of oral argument and, in an order amply supported by the evidence, found that plaintiffs' claims of irreparable injury (risk of institutionalization) were unlikely to succeed. He denied a request for a preliminary injunction. D. Ct. Order 2 n.4, 3. The panel majority, over Judge Rawlinson's dissent, reverses the district court's legal conclusions and factual findings, and remands for entry of a preliminary injunction as to the named plaintiffs. The injunction prohibits the state from enforcing the reductions against the named plaintiffs, and the panel "leave[s] it to the

---

[8]Two advocacy organizations and the union that represents Washington's home care workers are also plaintiffs in this suit. *M.R.*, 663 F.3d at 1106.

[9]An "integrated setting" is one where a disabled individual is cared for in a community-type setting (i.e., at-home or outpatient), as opposed to a nursing home.

district court to determine on remand whether, in light of this opinion, broader preliminary injunctive relief is appropriate." 663 F.3d at 1121.

## II. Reasons to Take This Case En Banc

The district court's order was correct on the law, on the facts, and on the standard for issuing a preliminary injunction. Now, after this decision, the ADA will block states from making even small, evenhanded cuts to programs which the state has voluntarily added to its Medicaid program. This is so even when the reductions are in response to severe budget deficits, and even when there is no evidence that anyone will be subjected to imminent institutionalization. Somehow, this is all done in the name of *prevention of discrimination*. Congress, with the passage of the ADA, certainly never contemplated nor sanctioned such a one-way ratchet on governmental spending. We should have gone en banc to correct course.

*1. The opinion's incorrect analysis of the ADA.* The panel held that there were "serious questions going to the merits" of whether a 10% cut to services in this voluntary and optional Medicaid program, which is being administered evenhandedly, violates the regulation that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). The panel held that, to prevail on a claim under the integration mandate, "a plaintiff need only show that the challenged state action creates a serious risk of institutionalization." 663 F.3d at 1116.

That is not the law. According to the Supreme Court in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), the integration mandate means that "[s]tates are required to provide community-based treatment for persons with . . . disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, *and the placement can be reasonably*

*accommodated, taking into account the resources available to the State and the needs of others with . . . disabilities.*" *Id.* at 607 (emphasis added). But it is not disputed that Washington *does* "provide community-based treatment for persons with . . . disabilities" on an even-handed—even *exemplary*—basis.

There is no claim that Washington discriminates against community-based recipients by favoring institutionalized recipients with more or better "services, programs, [or] activities." *See* 28 C.F.R. § 35.130(d). *Olmstead* requires that community-based treatment be provided only after "taking into account the resources available to the State and the needs of others . . . with disabilities." 527 U.S. at 607. Here, the reductions in personal care service hours were applied in view of "resources available" and on a rational basis depending on need, and not on any discriminatory basis as between the community-based recipient and the institutionalized recipient.

The panel majority seems to view an across-the-board reduction of services to the community-based recipients to be "discrimination" because of the *effect* the reduction might have: to cause some community-based recipients to seek institutional care. But even the broad view of "discrimination" endorsed in *Olmstead* requires some form of differential treatment amongst the disabled. What the Supreme Court held in *Olmstead* is that the disabled are discriminated against if states, without justification, provide services to the institutionalized that are not provided to community-based recipients, thus forcing certain individuals into institutionalized settings.[10] *See* 527 U.S. at 597, 600-01. What *Olmstead* did *not* hold—indeed what it specifically stated it was *not holding*—was that any sort of a level of services must be provided to *prevent* institutionalization, else the recipient would suffer discrimination.

---

[10]Our court explained this principle clearly: "where the issue is the *location* of services, not *whether* services will be provided, *Olmstead* controls." *Townsend v. Quasim*, 328 F.3d 511, 517 (9th Cir. 2003) (emphasis in original). *See infra* pp. 6974-75.

Indeed, the district court plainly found that the record showed no such discrimination was occurring here, stating that "the record does not reflect that the State is providing services to individuals in institutions that it has declined to provide to individuals living in community-based settings. To the contrary, plaintiffs' evidence demonstrates that individuals living in community-based settings currently receive *more* and *better* care than individuals living in institutions." D. Ct. Order 36. The panel majority's opinion unfortunately ignored this finding.

An example might help. If the reduction of personal services were to eliminate *specific services* from the personal care program—for instance, dressing care services—but that service were to be provided by institutionalized care, that would be discrimination as interpreted by *Olmstead*: this needed service, provided only in institutions, would require the disabled person to seek institutional care. Here, though, there is no allegation, much less proof, that the state made any cuts to *particular* personal care services. There is no service at all that was provided in 2009 that is no longer provided after the reductions.

The gravamen of the claim, then, is simply that the plaintiffs want *more* hours of the personal care services they would receive in their homes following the reductions. It is understandable for the plaintiffs to want more services to be provided at no cost to them. The problem is that the plaintiffs are not *entitled* to any particular level of services—or a "standard of care"—under the ADA. This is especially so because more services for these plaintiffs necessarily means less for others, since "the State has submitted unrefuted evidence that it will need to make drastic cuts in other state programs if this Court grants plaintiffs' requested preliminary injunction." D. Ct. Order 41.[11]

---

[11]The reason the panel majority in *M.R.* rejected this finding by the district court—a finding which was supported by unrefuted evidence—is:

The panel's view of what constitutes "discrimination" conflicts with *Olmstead*, which explicitly conditioned benefits to community-based recipients on "resources available." *Olmstead* condemns only *"unjustified* isolation." 427 U.S. at 597 (emphasis added). Now, under *M.R.*, states must provide community-based services in a way that eliminates any "serious risk" that any individual currently receiving in-home services will be transferred to a nursing home. The opinion demands that community-based care meet a certain standard: the program must guarantee that each disabled individual currently receiving benefits in the program is able to continue to live in the community indefinitely. But the ADA requires only non-discrimination in the provision of services amongst the community-based recipients, or between the community-based recipients and the institutionalized, when a state allocates discretionary resources. The ADA does not require that any particular services be provided, or that any particular level of services be provided. Indeed, the Supreme Court has already rejected the opinion's view of the ADA:

> We do not in this opinion hold that the ADA imposes on the States a *"standard of care"* for whatever medical services they render, or that the ADA requires States to *"provide a certain level of benefits* to individuals with disabilities."   . . . We do hold, however, that States must adhere to the ADA's non-

"[i]t is clear that money spent on behalf of the Plaintiffs is money that will not be spent on other programs. But it is not clear from the evidence in the record or from the arguments made to us precisely what those other programs are and the extent to which they would be cut." 663 F.3d at 1119-20. The opinion did not grace us with what details were missing. Should the state submit an entire budget, passed with alternatives, should a panel of judges on this court invalidate some cuts? That would require the court to engage in mini-management for which it is ill-suited. The impossibility of a state's ever prevailing on the basis of Washington's showing here is exactly what *Olmstead* called "unacceptable" because "it would leave the State virtually defenseless once it is shown that the plaintiff is qualified for the service or program she seeks." 527 U.S. at 603.

discrimination requirement with regard to the ser-
vices they in fact provide.

*Olmstead*, 527 U.S. at 603 n.14 (quoting *Olmstead*, 527 U.S.
at 624 (Thomas, J., dissenting)) (emphases added). The
Court's language helps to interpret the integration mandate's
language. 28 C.F.R. § 35.130(d) requires the states to "admin-
ister" existing programs and services in the most integrated
setting possible, so as to avoid discrimination. The mandate
does not require the states to "provide" or "maintain" pro-
grams to avoid discrimination.

It gets worse, though, because we too have already rejected
*M.R.*'s limitless expansion of *Olmstead*. In *Townsend v. Qua-
sim*, 328 F.3d 511 (9th Cir. 2003), we properly read *Olmstead*
to have a limited scope when we stated that "where the issue
is the *location* of services, not *whether* services will be pro-
vided, *Olmstead* controls." *Id.* at 517; *see also Olmstead*, 527
U.S. at 612 (Kennedy, J., concurring in judgment) ("No State
has unlimited resources, and each must make hard decisions
on how much to allocate to treatment of diseases and disabili-
ties. . . . The judgment [regarding resource allocation], how-
ever, is a political one and not within the reach of the
statute."). Yet, despite this clear language in *Olmstead* and the
instruction from our court in *Townsend*, a new standard of
care based on a recipient's subjective claims is exactly what
the panel requires from the state of Washington. After *M.R.*,
that standard can never be reduced.

In the teeth of this precedent, the panel majority's opinion
gives what amounts to controlling interpretive deference to a
"statement of interest" the DOJ filed in support of the plain-
tiffs. *See M.R.*, 663F.3d at 1117. In *Olmstead*, the Court
declined to consider whether to accord deference to the DOJ's
views of the ADA and implementing regulations. 527 U.S. at
598.[12] Notwithstanding the Supreme Court's forbearance, the

_____

[12]There, the United States participated as amicus at the Supreme Court
level. The Court also noted three previous appellate-level amicus briefs,

panel majority here contends that this "statement of interest," filed in district court, is the equivalent of an "agency's interpretation of its own regulation," which the panel then says is "controlling unless plainly erroneous or inconsistent with the regulation." *M.R.*, 663 F.3d at 1117 (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997)).

This is one leap too far. First, unlike *Olmstead*, where the United States participated through the appearance of the Solicitor General, the DOJ did not even submit an amicus brief to our court in this appeal, despite the fact that its position lost in district court. Second, a "statement of interest" has not gone through anywhere near the rigorous controls as has a regulation adopted pursuant to the Administrative Procedure Act, or even a Supreme Court amicus brief. Third, in any event, the DOJ's view leads to a plainly unreasonable interpretation of the plain text of the ADA, so it must be rejected. *See Auer*, 519 U.S. at 461 (agency interpretation of a regulation not controlling if "plainly erroneous or inconsistent with the regulation" (internal quotation marks omitted)).[13] It is

and observed that "We need not inquire whether the degree of deference described in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), is in order; [i]t is enough to observe that the well-reasoned views of the agencies implementing a statute constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Olmstead*, 527 U.S. at 598 (1999) (internal quotation marks omitted; alteration in original). Notice also that the Court there referred to whether *Chevron* deference was in order. The Court did not even mention *Auer* deference, which is the form of deference used by the panel majority here.

[13]The panel also ignores the fact that our court has read *Auer* narrowly and refused to "give controlling deference" to "interpretations of statutes expressed for the first time in case-by-case amicus filings." *Christopher v. SmithKline Beecham Corp.*, 635 F.3d 383, 395 (9th Cir. 2011), *cert. granted* 132 S. Ct. 760 (2011). Moreover, the core principle in *Auer* that a court should *ever* substantially defer to an agency's interpretation of its own regulation, even if validly asked to do so in a brief filed before the tribunal deciding the case, has recently been cast into doubt by subsequent

plainly unreasonable to claim it is "discrimination" under the ADA when there is an even-handed reduction of a voluntarily-provided welfare benefit and no claim that this reduction will lead to anyone's imminent institutionalization.

Finally, in imposing on the states a standard of care for personal care service programs, we do not just depart from binding Supreme Court precedent. We also create a conflict with the Second Circuit. In *Rodriguez v. City of New York*, 197 F.3d 611 (2d Cir. 1999), decided after *Olmstead*, the Second Circuit considered a case where a class of mentally-disabled plaintiffs contended that New York violated the ADA because the state failed to provide "safety-monitoring services" in its personal-care services program. *Id.* at 613. As here, the plaintiffs claimed that the state's failure to do this rendered the personal care services provided "inadequate to meet their medical needs and to allow them to continue living in their homes." *Id.* at 614.

The Second Circuit recognized that this argument does not allege "illegal discrimination against the disabled" but instead presents a challenge to "the substance of the services provided." *Id.* at 618. This is because "[t]he ADA requires only that a particular service provided to some not be denied to disabled people." *Id.* The court thus rejected the "discrimination" claim. *Id.* In so doing, the Second Circuit also explained that *Olmstead* was "inapposite" in such a case because it does not "stand for the proposition that states must provide disabled individuals with the opportunity to remain out of institutions." *Id.* at 619. Instead, *Olmstead* means "only that States must adhere to the ADA's nondiscrimination requirement with

administrative law cases. *See Talk Am., Inc. v. Mich. Bell Tel. Co.*, 131 S. Ct. 2254, 2266 (2011) (Scalia, J., concurring) ("It is comforting to know that I would reach the Court's result even without *Auer*. For while I have in the past uncritically accepted that rule, I have become increasingly doubtful of its validity.").

regard to the services *they in fact provide*." *Id.* (quoting *Olmstead*, 527 U.S. at 603 n.14) (emphasis inoriginal).

The bottom line is simple enough: "[T]he disabilities statutes do not guarantee any particular level of medical care for disabled persons, *nor assure maintenance of service previously provided*." *Rodriguez*, 197 F.3d at 619 (quoting *Cerpac v. Health and Hosp. Corp.*, 147 F.3d 165, 168 (2d Cir. 1998)) (emphasis added). Yet "maintenance of service previously provided" is exactly what our court requires in *M.R.*[14]

The panel majority's insistence that Washington state provide a particular standard of care means the remainder of Ninth Circuit states must abandon any attempt to reduce voluntarily-provided, optional personal care services from their current levels. Instead, states are locked into a program they thought voluntary and optional, one *not* required by Medicaid—and *certainly* not required to continue at a particular service level. If a 10% reduction in hours in one of the nation's most generous programs creates a "serious risk of institutionalization," then it is hard to imagine what other reduction, in any state, will ever fail to meet the "serious risk" standard. This is because Washington state's entire personal care services program is essentially an at-home substitute for nursing home care. Almost by definition, if this program offers fewer hours and serves fewer people, more people will be at risk of needing to go into a nursing home. But, at worst, that risk is not caused by discrimination in the services actu-

---

[14]*Rodriguez* relied explicitly on the ADA itself, rather than the integration mandate. However, the Second Circuit's extensive discussion of *Olmstead* makes clear that its decision is directly applicable in this context, and that, following *Rodriguez*, the Second Circuit would have decided our case differently. Indeed, our own court has looked to *Rodriguez* in a case explicitly about the integration mandate, and stated: "*As Rodriguez makes clear*, where the issue is the *location* of services, not *whether* services will be provided, *Olmstead* controls." *Townsend*, 328 F.3d at 517 (first emphasis added).

ally provided, but by the lessening of the services previously provided.

Thus, plaintiffs will argue, applying the integration mandate to this type of service in the first place leads inexorably to the conclusion that the states that do *not* currently participate in this optional program are in violation of the ADA. If *cutting* personal care hours presents a "serious risk of institutionalization," the argument will go, surely providing *no* personal care services at all presents an even bigger risk of institutionalization. Now, after the panel majority's opinion in *M.R.*, there is no stopping point to the plaintiffs', activist organizations', and unions' claims that the "integration mandate" prohibits *any* reduction in services to the at-home disabled. This argument is absurd on its face, and we should have taken this case en banc now to stop plaintiffs' assertion of what they may style as an "inexorable" progression.

*2. The opinion's impermissible factfinding.* The panel majority acknowledged in its standard of review section that this court reviews a denial of preliminary injunction for abuse of discretion and that, in so doing, "we first look to whether the trial court identified and applied the correct legal rule to the relief requested. Second, we look to whether the trial court's resolution . . . resulted from a factual finding that was illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc). Our standard was drawn directly from the Supreme Court's language in *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 577 (1985) ("Based on our own reading of the record, we cannot say that either interpretation of the facts is *illogical* or *implausible*. Each has *support in inferences that may be drawn from the facts in the record*; and if either interpretation had been drawn by a district court on the record before us, we would not be inclined to find it clearly erroneous.") (emphases added). Yet the panel majority replaces the district court's amply-supported factual findings with its own findings. The

opinion fails to keep in mind my colleague Judge Farris's pithy line characterizing the "appropriate appellate function": while his colleague in dissent "would retry," Judge Farris was "content to review." *Li v. Ashcroft*, 378 F.3d 959, 964 n.1 (9th Cir. 2004).

The discussion of irreparable harm in the panel opinion focuses nearly exclusively on three of the twelve plaintiffs: M.R., C.B., and K.S. 663 F.3d at 1108-14. The facts the panel majority relates of their conditions are sad and unfortunate, as M.R. and C.B. in particular are severely disabled individuals who require extensive care on a daily basis. The plaintiffs contend that they have "demonstrated a likelihood of irreparable injury because they have shown that reduced access to personal care services will place them at serious risk of institutionalization." *Id.* at 1102. The panel majority agreed, overturning the district court's careful findings to the contrary. The panel majority reversed the district court because the state's responses to the plaintiffs' recitations of harm were "weak"[15] and the "the district court addressed these individualized showings in a generalized fashion." *Id.* at 1114.

On the contrary, the district court did indeed give individualized consideration to each plaintiff. For instance, after citing the declarations of nine of the named plaintiffs whose "medical conditions have deteriorated"—a group that includes both M.R. and C.B.—the district court said that "the Court is unable to determine whether the alleged threat of institutionalization these particular plaintiffs face is the result of the State's reduction in personal care service hours or the deterioration in their medical conditions." D. Ct. Order 25. In a lengthy passage, the district court also described evidence that contradicted the allegations of harm to the plaintiffs arising from the reduction, and the district court further noted that

---

[15]This word is a classic giveaway that the panel majority weighed the evidence anew, rather than applying the standard of appellate review of factfinding demanded by *Anderson* and *Hinkson*.

some of the allegations in the plaintiffs' declarations were "speculative at best." *Id.* at 25 n.31.

The district court also found that certain declarations did not show a likelihood of irreparable injury because plaintiffs had not attempted to raise the hours of personal care they claimed to need through the available ETR process. D. Ct. Order 26-27. For instance, in the case of plaintiff A.R., the district court said that it "can only conclude that the declarations relating to A.R. do not suggest a likelihood of irreparable injury because, until the State has had the opportunity to correct the gap in care through case management, the Court cannot determine whether the threat of harm is the result of the State's reduction, or the decision by A.R.'s guardian to give preference to the provider's convenience over A.R.'s care needs." *Id.* at 27. The panel opinion does not address this reasoning. Instead, it pretends this finding was not there.

Moreover, the panel majority's criticism of the district court's findings as impermissibly general is misplaced. The panel majority does not claim that the district court failed to comply with Fed. R. Civ. P. 52(a)(2), which requires that "[i]n granting or refusing an interlocutory injunction, the court must . . . state the findings [of fact] and conclusions [of law] that support its action." Instead, the panel majority conflates a criticism of *how* the district court *discussed* the evidence with an evaluation of the sufficiency of the evidence itself. This contradicts our circuit's test for "clear error," which turns only on whether there was a *sufficient evidentiary basis* for the determination the district court made, not how the trial court "addressed" the evidence in the record. Here, there was a sufficient evidentiary basis for the district court's findings.

In 2009, our en banc court closely tracked the Court's language in *Anderson* when it stated that factual findings would be overturned only if they were "illogical, implausible, or without support in inferences that may be drawn from the

facts in the record." *Hinkson*, 585 F.3d at 1263 (drawing on and quoting from *Anderson*, 470 U.S. at 577 (1985)). Yet, in direct contradiction to this mandatory analytical framework, the panel opinion never lets the reader know upon which of these shoals the district court's factual findings ran aground, or why. This error too demanded en banc review, because it constitutes a three-judge panel's departure from an en banc-approved standard.

### III.   The Effect of Our Decision

Under *M.R.*, states will be hard-pressed to reduce benefit levels in voluntarily-provided personal care services programs and, perhaps, in a variety of other voluntary social services programs. This not only departs from the text of the relevant statutes and regulations, but it presents two major practical problems. First, in the near term, states will not be able to balance their budgets. Second, in the longer term, if states do not have flexibility to cut the provision of such services, then they are far less likely to decide to provide the programs in the first place. Both of these cause serious harm to states and their citizens, yet this harm was entirely ignored by the panel majority.

Of course, I am not a state executive or legislative official, charged with administering the state budget, so do not take my word for it. Instead, look at the recent remarks of California Governor Jerry Brown regarding the state's $16 billion budget deficit. Why is the shortfall so large—and in particular so much larger than the $9 billion deficit forecast only months ago? "Tax receipts are coming in lower than expected," he said. "And the federal government *and the courts* have blocked us from making billions in necessary budget reductions."[16] At a press conference on Monday, May 14, 2012, Governor Brown noted:

---

[16]*See* J.J. McGrath, *California Budget Gap Widens to $16B from $9B*, Int'l Business Times (May 13, 2012), *available at* http://www.ibtimes.com/articles/340491/20120513/california-budget-deficit-taxes-cuts-transcript-video.htm?page=all (emphasis added).

> The fact is we're in a democratic society. We have so much money from the people, and we've got so much spending. We can have it be out of alignment for a while . . . but I've committed to getting it into balance. What that means is that things that are good in and of themselves have got to be stopped or curtailed if we're going to have balance. Otherwise, we borrow and sink deeper into debt, and you see Spain, Portugal, Italy, Ireland, England, they're all having trouble. While the short-term pain is real, I think the greater good is balancing the revenue with the spending.[17]

The majority ignores this fundamental reality of our democracy.

The long-term impact of the panel majority's decision and the inevitable path we will now be forced to follow is that legislators will think long and hard about ever again authorizing such voluntary and optional programs. After all, state legislators and executive officials are not blind to what we do here at the Ninth Circuit. Rather, those who govern in the states in our circuit will see the reductions we have blocked, even to voluntary, optional services like the one here, and then ask themselves: *why should we ever go through this battle again?* The harm that will come to all of us from these programs foregone—these legislative possibilities left untried—will be hard to measure. But it will be very real.

Fortunately, this is not a result demanded by the ADA, the facts of this case, or the balancing of the equities courts look to in issuing injunctions. Far from it. This result is one manufactured by the panel majority's stretched reading of the law, its mistreatment of the record, and its arrogation to itself of the factfinding function. We should have gone en banc to cor-

---

[17]*See* Video of Press Conference on May 14, 2012, *available at* http://www.calchannel.com/video-on-demand/.

rect this opinion's turn toward anti-democratic budgeting by judicial fiat.

---

**OPINION**

W. FLETCHER, Circuit Judge:

Plaintiffs, Washington State Medicaid beneficiaries with severe mental and physical disabilities, appeal the district court's denial of their motion for a preliminary injunction. Plaintiffs seek to enjoin the operation of a regulation promulgated by Washington's Department of Social and Health Services ("DSHS") that reduces the amount of in-home "personal care services" available under the state's Medicaid plan. The United States Department of Justice has filed a "statement of interest" in the district court supporting Plaintiffs' request for an injunction.

"Personal care services" provide assistance in performing basic life activities — such as eating, bathing, dressing, moving from place to place, and using the toilet — that Plaintiffs, because of their disabilities, cannot perform by themselves. To comply with Governor Christine Gregoire's executive order that directed an across-the-board reduction in all state agency expenditures, DSHS promulgated a regulation that cut the base hours of covered in-home personal care services by an average of 10 percent per beneficiary per month.

Plaintiffs argue principally that the regulation violates the antidiscrimination provisions of the Americans with Disabilities Act, 42 U.S.C. § 12132, and the Rehabilitation Act, 29 U.S.C. § 794(a), because the reduction in hours will substantially increase the risk that they will be institutionalized in order to receive care adequate to maintain their mental and physical health. The district court denied preliminary relief.

We reverse. We conclude that Plaintiffs have demonstrated a likelihood of irreparable injury because they have shown that reduced access to personal care services will place them at serious risk of institutionalization. We further conclude that Plaintiffs have raised serious questions going to the merits of their Rehabilitation Act/ADA claims, that the balance of hardships tips sharply in their favor, and that a preliminary injunction will serve the public interest. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011). We therefore remand for entry of a preliminary injunction.

## I.   Background and Procedural History

### A.   Factual Background

Medicaid is a cooperative federal-state program under which the federal government provides states with financial assistance to supply medical services to low-income people. *Arc of Wash. State Inc. v. Braddock*, 427 F.3d 615, 617 (9th Cir. 2005). State participation is voluntary, but once a state chooses to participate, the state must submit for federal approval a plan that complies with federal statutory and regulatory requirements. *Alexander v. Choate*, 469 U.S. 287, 289 n.1 (1985); *Townsend v. Quasim*, 328 F.3d 511, 514 (9th Cir. 2003). A state plan must cover the cost to eligible people of certain medical services, including inpatient and outpatient hospital care; laboratory and X-ray services; nursing facility care; and services provided by physicians, dentists, nurse-midwives, and pediatric or family nurse practitioners. *See* 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a)(1)-(5), (17), (21); 42 C.F.R. §§ 440.210, 440.220. Within this federal framework, however, states retain "substantial discretion to choose the proper mix of amount, scope, and duration limitations on coverage." *Alexander*, 469 U.S. at 303; *see also Beal v. Doe*, 432 U.S. 438, 444 (1977); 42 C.F.R. § 430.0.

States may, but need not, choose to subsidize other types of medical services, including "personal care services," the ben-

efit at issue here. *See* 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a)(24). "Personal care services" are:

> services furnished to an individual who is not an inpatient or resident of a hospital, nursing facility, intermediate care facility for the mentally retarded, or institution for mental disease that are
>
> > (A) . . . authorized for the individual in accordance with a service plan approved by the State,
> >
> > (B) provided by an individual who is qualified to provide such services and who is not a member of the individual's family, and
> >
> > (C) furnished in a home or other location.

*Id.* § 1396d(a)(24); *see also* 42 C.F.R. § 440.167(b) (clarifying that a family member is "a legally responsible relative"); Ctrs. for Medicare and Medicaid Servs., State Medicaid Manual § 4480(C), at 4-495 (1999) (personal care services "include a range of human assistance provided to persons with disabilities and chronic conditions . . . which enables them to accomplish tasks that they would normally do for themselves if they did not have a disability," and "most often relate[ ] to . . . eating, bathing, dressing, toileting, transferring, . . . maintaining continence, . . . personal hygiene, light housework, laundry, meal preparation, transportation, grocery shopping, using the telephone, medication management, and money management").

Washington has elected to cover the cost of personal care services, which the state defines as "physical or verbal assistance with activities of daily living and instrumental activities of daily living provided because of a person's functional disability." Wash. Rev. Code § 74.39A.009(18). The state defines "activities of daily living," in turn, to include bathing,

bed mobility, body care, dressing, eating, locomotion inside and outside one's room and immediate living environment, walking in one's room and immediate living environment, medication management, toilet use, transferring between surfaces, and personal hygiene. WASH. ADMIN. CODE § 388-106-0010. The state defines "instrumental activities of daily living" as including meal preparation, ordinary housework, essential shopping, wood supply when wood is used as one's sole source of heat, travel to medical services, managing finances, and telephone use. *Id.*

Washington's DSHS administers the state's Medicaid programs. *See* 42 U.S.C. § 1396a(a)(5); WASH. REV. CODE § 74.09.530. DSHS covers the cost of personal care services for approximately 45,000 people. Some 15,000 of those beneficiaries are "categorically needy" participants in the state's Medicaid plan. The remaining 30,000 beneficiaries participate in one of Washington's Medicaid waiver programs, "under which the Secretary of Health and Human Services is authorized to waive certain Medicaid requirements for innovative or experimental state health care programs." *Townsend*, 328 F.3d at 514. Consistent with Congress's preference for community rather than institutional care, "the waiver program provides Medicaid reimbursement to States for the provision of community-based services to individuals who would otherwise require institutional care, upon a showing that the average annual cost of such services is not more than the annual cost of institutional services." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 601 n.12 (1999) (citing 42 U.S.C. § 1396n(c)).

Before Washington may cover the cost of in-home personal care services to participants in a Medicaid waiver program, the state must have made "a determination that but for the provision of such services the individuals would require the level of care provided in a hospital or a nursing facility or intermediate care facility for the mentally retarded the cost of which could be reimbursed under the State plan." *Id.*

§ 1396n(c)(1); 42 C.F.R. §§ 435.217, 441.302(c); *see also, e.g.*, Wash. Admin. Code § 388-106-0310(4) (participants in Community Options Program Entry Services ("COPES") waiver program must "need the level of care provided in a nursing facility"); *id.* §§ 388-106-0410(4), 388-106-0510(4) (same with respect to participants in Medically Needy Residential Waiver ("MNRW") and Medically Needy In-Home Waiver ("MNIW") programs); *id.* § 388-845-0030(2) (developmentally disabled participants in Home and Community-Based Services ("HCBS") waiver programs must need the level of care provided in an intermediate care facility for the mentally retarded).

DSHS determines the number of hours of in-home personal services care to which a Medicaid beneficiary is entitled through the Comprehensive Reporting Evaluation ("CARE"). *See* Wash. Admin. Code § 388-106-0050 to -0145. The Washington Supreme Court has described CARE as follows:

> In the initial stage of a CARE evaluation, the individual is scored on factors such as an individual's ability to perform daily activities and an individual's mental status. The individual is then assigned to 1 of 17 classification groups, each group having a set number of base . . . hours associated with it. Once these base hours are established, an assessor individually considers the recipient's self-performance and the amount of informal support available for the recipient's activities of daily living (ADL) and instrumental activities of daily living (IADL). The recipient's level of informal support for each ADL and IADL then reduces the base hours allocated to that recipient by a predetermined percentage.

*Samantha A. v. Dep't of Soc. & Health Servs.*, 256 P.3d 1138, 1140 (Wash. 2011) (en banc) (internal citation omitted); *see also, e.g.*, *Jenkins v. Wash. Dep't of Soc. & Health Servs.*, 157 P.3d 388, 389-90 (Wash. 2007) (en banc). DSHS sets the base

monthly hours associated with each classification group by regulation. Wash. Admin. Code § 388-106-0125. DSHS conducts CARE reassessments at least annually, or whenever a beneficiary's ability to care for himself changes. *Id.* § 388-106-0050(1). A beneficiary who disagrees with his CARE evaluation may appeal the evaluation in an administrative hearing. *Id.* § 388-106-1305. A beneficiary who remains dissatisfied with his allocated hours of assistance may request additional hours through an Exception to Rule ("ETR"). *Id.* § 388-440-0001. DSHS will grant an ETR when "[t]he client's situation differs from the majority; . . . [i]t is in the interest of overall economy and the client's welfare; and [i]t increases opportunities for the client to function effectively." *Id.* § 388-440-0001(1)(b)-(d).

Once the CARE evaluation sets the number of hours to which a beneficiary is entitled, the beneficiary and his DSHS case manager work together to design a plan of care that specifies the services that the beneficiary will receive as well as the caregivers who will provide those services. *Id.* §§ 388-106-0045, 388-106-0130. At all times, a beneficiary has the right to choose where he will receive authorized services (for example, in his home, in a residential facility, or in a nursing home), *id.* § 388-106-0030; to "[t]ake part in and have [his] wishes included in planning [his] care," *id.* § 388-106-1300(13); and to "[c]hoose, fire, or change" his caregiver, *id.* § 388-106-1300(14).

On September 13, 2010, Governor Gregoire issued an executive order stating that because of "the national economic downturn" and "revenues [that] have fallen short of projections," the state's general fund was in danger of running a deficit. Exec. Order No. 10-04, Ordering Expenditure Reductions in Allotments of State General Fund Appropriations (Sept. 13, 2010), *available at* http://www.governor.wa.gov/execorders/eo_10-04.pdf. Governor Gregoire ordered an across-the-board reduction in general fund appropriations to all state agencies, in an amount to be computed by the state's Office of Finan-

cial Management. *Id*; *see* WASH. REV. CODE § 43.88.110(7) ("If at any time during the fiscal period the governor projects a cash deficit in a particular fund or account . . . the governor shall make across-the-board reductions in allotments for that particular fund or account so as to prevent a cash deficit."). The Office of Financial Management, in turn, determined that each state agency would be required to reduce its allotment from the general fund by 6.287 percent. *See* Office of Fin. Mgmt., Allotment Reduction Instructions for Across-the-Board Cuts Mandated by Executive Order 10-04, at 2 (Sept. 16, 2010), *available at* http://www.ofm.wa.gov/budget/instructions/allotment/Allotment_reduction_instructions 091610.pdf.

To comply with the governor's order, DSHS promulgated an emergency regulation that reduced the base monthly hours of in-home personal services care authorized for each CARE classification group, effective January 1, 2011. *See* Wash. Reg. 11-02-041 (Dec. 30, 2010) (codified at WASH. ADMIN. CODE § 388-106-0125), *available at* http://apps.leg.wa.gov/documents/laws/wsr/2011/02/11-02-041.htm. DSHS applied the lowest percentage reductions to the classification groups composed of the most disabled beneficiaries. *See* WASH. REV. CODE § 74.09.520(4) ("Any reductions in services made necessary for funding reasons should be accomplished in a manner that assures that priority for maintaining services is given to persons with the greatest need as determined by the assessment of functional disability."). For example, DSHS reduced the base monthly hours for people in group D High from 277 to 260, a 6.1 percent decrease. Wash. Reg. 11-02-041. By contrast, DSHS reduced the monthly base hours for people in group B Low from 47 to 39, a 17 percent decrease. *Id.* The average reduction in hours across all groups was about 10 percent. Susan Dreyfus, DSHS's Director, declared in January 2011 that the reduction in hours would save $19.2 million in the five months then remaining in the 2011 fiscal year. DSHS acknowledged in agency planning documents that "[w]ith reduced hours, in-home clients will have to choose which

tasks their employees spend their time on and there may not be enough time to complete all tasks." Moreover, DSHS anticipated that "[a]t the higher percentage reductions, some needed tasks may not be completed on a regular basis. In some cases, a safe in-home plan of care will not be possible and clients may need to go to community residential or nursing facility settings."

On December 6, 2010, about three weeks before the reduction was to take effect, DSHS mailed notice of the change to beneficiaries. The notice stated that "you will receive fewer personal care hours each month starting January 1, 2011," set forth the beneficiary's current and revised monthly hours, and computed the difference. The notice stated that "[t]his notification serves as an amendment to your plan of care. You will need to work with your personal care worker to prioritize tasks within this reduced number of monthly authorized hours." Finally, the notice explained that DSHS

> is making this change in response to the Governor's September 14th Executive Order 10-04 for 6.3% reductions. This was one of a number of changes made across government to address the State's revenue shortfall.

> There are no appeal rights for this change through the Office of Administrative Hearings because this is a service change directed by the governor and applies to the entire program. We know these changes may be difficult for you. If you have questions or concerns about changes to your services, please contact your case manager.

## B. Procedural History

On December 23, 2010, Plaintiffs — 14 recipients of in-home personal services care whose hours were reduced, two advocacy organizations, and a union that represents Washing-

ton home-care workers — brought suit in federal district court for the Western District of Washington. The 14 individual plaintiffs sued on behalf of a proposed class of "Medicaid-eligible individuals in the State of Washington living at home who were assessed to need personal care services based upon individualized CARE assessments of their needs and who received these Medicaid services in accordance with their assessment[s] until DSHS reduced their services to below their level of need for budgetary reasons alone." Plaintiffs alleged that the regulation violated the Americans with Disabilities Act, 42 U.S.C. § 12132, the Rehabilitation Act, 29 U.S.C. § 794(a), due process, and various statutory and regulatory Medicaid requirements. Plaintiffs sought a declaratory judgment, as well as a temporary restraining order and preliminary and permanent injunctions prohibiting DSHS from implementing the regulation. In the alternative, Plaintiffs sought to enjoin the reduction in hours until beneficiaries received individual CARE reassessments, notice of alternative institutional placements, and administrative hearings.

The district court denied the motion for a TRO and deferred hearing on the motion for a preliminary injunction. Plaintiffs appealed the denial of the motion for a TRO, prompting the district court to stay proceedings and cancel a scheduled hearing on Plaintiffs' motion for a preliminary injunction. On appeal, a motions panel of this court stayed implementation of the emergency regulation pending the district court's disposition of the motion for a preliminary injunction. The panel concluded that denial of the TRO was reviewable "because the district court took the hearing for the motion for preliminary injunction off calendar," making denial of the TRO "tantamount for present purposes to the denial of a motion for a preliminary injunction." On the merits, the panel determined that a stay pending a hearing on the motion for a preliminary injunction was justified because "[n]o other relief is available that will remedy the irreparable injury which continues to occur pending such hearing."

On remand, the district court denied Plaintiffs' motion for a preliminary injunction. The court determined that Plaintiffs failed to satisfy any prong of *Winter v. Natural Res. Def. Council*, 555 U.S. 7 (2008). According to the court, Plaintiffs did not demonstrate a likelihood of irreparable injury because they "failed to submit evidence that the reduction will deny beneficiaries needed services, or that it will create a serious risk of institutionalization." Nor, in the view of the court, were Plaintiffs likely to succeed on the merits. Plaintiffs were unlikely to prevail on their ADA/Rehabilitation Act claim because "the State's budget reduction does not leave individuals with no choice [but] to submit to institutional care to obtain needed services" and because "it is likely that requiring the State to continue current funding levels for personal care services indefinitely would constitute a fundamental alteration in the State's Medicaid program." Implementation of the emergency regulation did not violate due process because "Medicaid recipients are not entitled to notice and a hearing when the State implements a mass change that affects . . . all recipients." The court rejected Plaintiffs' Medicaid claims by adopting the reasoning of its order denying Plaintiffs' motion for a TRO. Finally, the balance of hardships and the public interest favored DSHS because the challenged reductions "do not involve medical care." The court conceded that "a few of the plaintiffs" might "ultimately require institutionalization as a result of the State's reduction in services." However, the court found "the possible threat of institutionalization for a few personal care service beneficiaries" outweighed by "the State's interest in balancing the competing needs of a host of different state-sponsored social service programs that currently provide aid to a diverse group of medically and financially disadvantaged state residents."

Plaintiffs appealed.

## II.   Standard of Review

We review the denial of a preliminary injunction for abuse of discretion. *Alliance for the Wild Rockies*, 632 F.3d at 1131.

A district court abuses its discretion if it bases its decision "on an erroneous legal standard or clearly erroneous findings of fact." *Id.* (quoting *Lands Council v. McNair*, 537 F.3d 981, 986 (9th Cir. 2008) (en banc)). We review a district court's legal conclusions *de novo* and its factual findings for clear error. *Id.* (quoting *Lands Council*, 537 F.3d at 986-87). In doing so, "we first look to whether the trial court identified and applied the correct legal rule to the relief requested. Second, we look to whether the trial court's resolution . . . resulted from a factual finding that was illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc).

To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. A preliminary injunction is proper if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest. *Alliance for the Wild Rockies*, 632 F.3d at 1131-32.

## III.   Discussion

For the reasons that follow, we conclude that the district court abused its discretion in denying the motion for a preliminary injunction under the standard articulated in *Alliance for the Wild Rockies*. We reach only Plaintiffs' claims under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act.

### A.   Irreparable Injury

The 12 named Plaintiffs remaining in this litigation submitted substantial evidence that the emergency regulation threat-

ens them with a serious risk of institutionalization.[1] DSHS contested this evidence as to some named Plaintiffs, but as to others it offered either unsubstantiated and conclusory responses or no responses at all. The district court rejected Plaintiffs' showing by relying on three general rationales. It wrote that Plaintiffs "fail to show a threat of harm because they (1) ascribe the threat of institutionalization to [their] deteriorating medical conditions, unrelated to the provision of personal care services hours; (2) demonstrate ineffective management of currently allocated personal care services hours; or (3) identify non-personal care services as the cause of their predicted institutionalization." We conclude that the district court did not sufficiently consider individualized evidence that the named Plaintiffs were likely to suffer irreparable injury. We describe three Plaintiffs whose situations illustrate the inadequacy of DSHS's responses, as well as the inadequacy of the general rationales, to counteract Plaintiffs' showing of the likelihood of irreparable injury.

### 1.　M.R.

Lead plaintiff M.R., a 37-year-old woman, suffers from severe mental retardation, daily grand and petite mal seizures, scoliosis, cerebral palsy, hypothyroidism, and mood disorder. M.R. lives with her mother, a registered nurse, who provides personal care services. M.R.'s mother assists her with almost all basic activities of daily life, including eating, toilet care, bathing, dressing, medication management, and moving from place to place. She prepares all of M.R.'s meals and feeds M.R. through a tube when she refuses to eat. M.R.'s feeding tube "requires extensive maintenance because the tube was inserted too low and has a tendency to ooze and become infected, and because [M.R.] has a tendency to grab and pull

---

[1]Two of the original 14 named Plaintiffs no longer allege that they face a risk of institutionalization. Plaintiff M.J.B. has received an ETR increasing her authorized hours, and Plaintiff H.C. has died, for reasons unrelated to the hours reduction.

on it." M.R. is incontinent, wears adult diapers, and cannot use the toilet or clean herself without assistance. "Frequently," M.R. "has accidents" and "[a]s a result of incontinence, . . . must bathe at least twice a day to remove urine and sometimes feces." M.R. likes to choose her own clothing, but needs her mother's assistance to dress and undress herself. Because of her scoliosis and cerebral palsy, M.R. "requires assistance for walking, . . . is unsteady on her feet, . . . has poor balance and unequal leg length, and her knees buckle." M.R.'s mother administers her numerous prescription medications through her feeding tube several times a day.

M.R. participates in a Medicaid waiver program administered by DSHS's Division of Developmental Disabilities. That is, M.R. is eligible for full-time institutional care, *see* 42 U.S.C. § 1396n(c)(1), WASH. ADMIN. CODE § 388-845-0005, but M.R.'s mother has chosen to care for her at home "because her extensive personal care and medical needs are best served at home . . . . M.R. loves the independence she is afforded by living at home to set her own schedule, do puzzles, color or trace letters, and spend time with [her mother] playing with beads or sorting coins." M.R.'s CARE assessment assigned her to group D Medium-High, a designation that entitled her to 236 hours of in-home personal care services per month. As is true of many family providers of personal care services, M.R.'s mother provides more than 236 hours of care per month; the additional hours go uncompensated. The emergency regulation reduced M.R.'s authorized hours of compensated time to 215 per month, a decrease of 8.9 percent.

Before the challenged regulation took effect, a DSHS assessment of M.R. concluded that her household was in "crisis mode" and at "serious risk of failure." The emergency regulation, M.R.'s mother declared, "will push us, in our already vulnerable situation, over the edge. . . . I will have to find a job outside of the house and cut back the time spent caring for M.R. . . . Already, I am stretched thin and am living on the

margin. . . . I cannot provide more care for no pay when already there are insufficient funds to keep our household afloat." M.R.'s mother declared, "[i]f M.R.'s hours are reduced from their present levels, I will have no other option but to take another job, which will require moving M.R. into an institutional facility. I cannot afford to continue giving services at the rate that I have[.] I have to get an outside job, and I know of no other individual, Adult Family Home or Personal Care Provider who can take care of M.R. due to her medical and behavioral issues." If M.R.'s mother is forced to take a paying job outside the home, M.R. will lose more than just 21 hours of care per month. She will lose the 21 compensated hours, but she will also lose the uncompensated hours that her mother was previously able to provide because she was not employed outside the home.

Because M.R. has difficulty communicating, is "disruptive and aggressive," and "makes unwanted physical contact with others . . . by trying to hug them or assault them," she will likely suffer in an institutional setting; indeed, she has previously been expelled from two Adult Day Health facilities. Institutional placement will exacerbate M.R.'s already severe mental and physical disabilities. Dr. William Gardner, an expert in habilitative mental health treatment, declared that "[w]hen individuals with . . . developmental disabilities . . . would be able to live successfully in the community, but are institutionalized because of insufficient home and community based support, that is likely to result in frustration, despair, hopelessness, and the severe deterioration of their mental and often physical health."

In response to M.R.'s factual allegations, DSHS introduced a declaration from Geri-Lyn McNeill, a DSHS program manager. McNeill has never met M.R. McNeill declared that she "spoke to [M.R.'s] case manager[;] he does not believe that the decrease in hours would significantly increase the risk of injury, health deterioration or institutionalization for M.R."

The district court found that M.R. had made an insufficient showing of irreparable injury for three reasons, none of them specific to M.R. First, the court determined that M.R.'s medical condition, like that of eight other named Plaintiffs (S.J., A.B., An.B., M.B., J.B., J.H., D.W., and C.B.), had "deteriorated since [her] last CARE assessment." Consequently, the court was "unable to determine whether the alleged threat of institutionalization [M.R.] face[s] is the result of the State's reduction in personal care service hours or the deterioration in [her] medical condition[ ]."

This finding misapprehends the law of causation in the context of an irreparable injury inquiry. M.R. did indeed provide evidence that her condition had deteriorated since her July 2010 CARE assessment. She suffered infections and injured her head, back, and chin during grand mal seizures. M.R.'s feeding tube fell out, leaving her with an open wound and causing dehydration. Her replacement feeding tube makes it painful for M.R. to eat and drink, so her mother must give her food and water in smaller, more frequently administered, quantities. M.R.'s mobility has also worsened, making it more difficult for her mother to help her use the toilet and clean herself. M.R.'s decline in health has necessitated more trips to hospitals and physicians for care, and these trips consume more time because M.R. cannot move as easily as she once could.

**[1]** M.R.'s mother's filed two declarations. Her first declaration, filed before any of the incidents of deterioration just discussed occurred, established that the reduction in hours would threaten M.R. with institutionalization even in her pre-deterioration condition. Her second declaration, which described M.R.'s deteriorating condition, showed that the risk of institutionalization had grown, not that it had newly arisen. A plaintiff who seeks preliminary injunctive relief must show "that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. She need not further show that the action sought to be enjoined is the exclusive cause of the

injury. *See, e.g.*, *Harris v. Bd. of Supervisors*, 366 F.3d 754, 766 (9th Cir. 2004). In *Harris*, we affirmed a preliminary injunction barring Los Angeles County from closing one hospital that served indigent patients and reducing the number of beds at another. *Id.* at 766-67. We determined that the patients had shown that reducing the available public health care facilities would likely cause them irreparable harm that "includes pain, infection, amputation, medical complications, and death due to delayed treatment." *Id.* at 766. This was so "[a]lthough delays exist in the stretched county health care system already." *Id.* We affirmed because "exacerbation of the current overcrowded situation and additional suffering [could] be avoided" by enjoining the hospital closures. *Id.*

Likewise, in *Brown v. Plata*, 131 S. Ct. 1910, 1936-37 (2011), the Supreme Court affirmed an injunction ordering a reduction in California's prison population even though the constitutional violations that prompted the injunction — systemwide deficiencies in the provision of medical and mental health care — "were caused by factors in addition to overcrowding and . . . reducing crowding in the prisons would not entirely cure the violations." *Id.* at 1936. Applying the restrictive standard set forth in the Prison Litigation Reform Act — legislation designed to "curb[ ] the equitable discretion of district courts," *Miller v. French*, 530 U.S. 327, 339 (2000) — the Court concluded that overcrowding was a "primary cause" of the constitutional violations. 131 S. Ct. at 1923, 1936 (quoting 18 U.S.C. § 3626(a)(3)(E)(I)). The court reached this conclusion notwithstanding its acknowledgment that "[i]n addition to overcrowding the failure of California's prisons to provide adequate medical and mental health care may be ascribed to chronic and worsening budget shortfalls, a lack of political will in favor of reform, inadequate facilities, and systemic administrative failures." *Id.* at 1936.

**[2]** Like many Washington beneficiaries of in home personal care services, M.R. suffers from numerous mental and physical disabilities, some of them degenerative. Her medical

condition will worsen over time, and as her health declines she will face an increased risk of institutionalization. That risk is not exclusively attributable to the challenged regulation reducing the number of compensated hours of assistance, but the challenged regulation and resulting reduction in hours will exacerbate that risk. The regulation therefore inflicts cognizable irreparable injury for purposes of a preliminary injunction. *See Harris*, 366 F.3d at 766.

Second, in the alternative, the district court found that M.R. had not shown a likelihood of irreparable injury because there was "evidence controverting the possibility of any harm." The sole basis in the record for the court's finding was McNeill's declaration, which relied on the conclusory opinion of a DSHS case manager who "does not believe that the decrease in hours would significantly increase the risk of injury, health deterioration, or institutionalization for M.R." McNeill's declaration contains neither the detail nor the substantiation necessary to rebut M.R.'s detailed factual showing. *See United States v. Navarro*, 979 F.2d 786, 789 (9th Cir. 1992).

Third, the district court concluded that M.R., like four other named Plaintiffs (T.M., M.B., A.B., and A.R.), had not made a showing of cognizable harm because she "argue[s] that [she] face[s] a threat of institutionalization because the budget reduction will reduce available services for supervision, exercise, and medication management." The court reasoned, "personal care services do not include supervision, exercise, or medication management." DSHS concedes that the court erred as a matter of law by excluding medication management from personal care services. *See* Wash. Admin. Code § 388-106-0010. Further, the court's conclusion does not sufficiently take into account M.R.'s evidence. M.R.'s "personal care services" do include supervision, and without such supervision, she faces the threat of institutionalization. M.R.'s mother declared that she "needs constant supervision" in order to perform activities of daily living and instrumental activities of daily living that constitute covered personal care

services. For example, if left unsupervised, M.R. "could wake up, try to get out of bed, and fall with no ability to get up." *Compare* Wash. Admin. Code § 388-106-0010 (covered activities of daily living include "bed mobility" and "locomotion in room and immediate living environment"). In addition, M.R. "could have bowel and bladder accidents and be unable to get clean, resulting in skin breakdowns and hospitalization." *Compare* Wash. Admin. Code § 388-106-0010 (covered activities of daily living include "toilet use" and "personal hygiene"). M.R. could "pull out the feeding tube" and therefore "wouldn't get adequate nutrition or medications on schedule." *Compare* Wash. Admin. Code § 388-106-0010 (covered activities of daily living include "eating" and "medication management").

## 2.   C.B.

Plaintiff C.B., a 55-year-old woman, suffers from spinal stenosis, congestive heart failure, emphysema, hepatitis B and C, chronic bacterial infections, neuropathy in both hands and feet, high blood pressure, depression, and bipolar disorder. C.B. requires assistance with a range of tasks, including cooking, transporting herself to and from appointments with physicians, bathing and dressing herself, and cleaning her home. C.B. participates in Washington's COPES Medicaid waiver program. The emergency regulation reduced her authorized in-home personal services care hours from 133 to 115 per month, a 13.5 percent decrease. As a result, C.B. stated, her caregiver Tia Davis "will be forced to change her work schedule and cut back the time spent on taking me to and from doctor's appointments and household chores such as cooking and helping me bathe." C.B.'s health will likely suffer because absent Davis's assistance she will have difficulty transporting herself to doctor's appointments; will bathe herself and attend to her personal hygiene less capably; will not clean her home, which will exacerbate the symptoms of her bacterial infections; and will feed herself by preparing only microwaveable hot meals, with adverse consequences for her high blood pres-

sure and obesity. If these predictable results occur, C.B. "will face severe deterioration in [her] condition and [will] have to seek emergency room care and admission to a nursing home from an even weaker point."

DSHS did not respond to C.B.'s evidence. The district court, relying on a single sentence in a declaration in which C.B. stated that her "health has deteriorated," rejected C.B.'s showing of irreparable injury on the same ground that it rejected the showings made by M.R. and seven other named Plaintiffs. That is, the court stated that it was "unable to determine whether the alleged threat of institutionalization these particular plaintiffs face is the result of the State's reduction in personal care service hours or the deterioration in their medical conditions."

**[3]** The court did not sufficiently analyze C.B.'s individualized evidence and the impact of the emergency regulation on her specific clinical situation. C.B. established that because of the hours reduction, Davis will spend less time with her. Consequently, Davis will cook fewer meals for C.B., so that C.B. will "eat microwaveable instant foods that are generally high in fat and sodium and detrimental to my pre-diabetes, high blood pressure, and obesity." Davis "will likely have to spend less time taking C.B. to her doctor's appointments," resulting in compromised care because C.B. "[v]ery rarely . . . has energy to use the paratransit services alone, as she finds it much more cumbersome and more difficult for her to get around without the one-on-one assistance I provide." Necessarily, C.B. will bathe and clean her home less often because she can do neither by herself. When C.B. is left alone, her apartment falls into "disarray — pet fur everywhere, dirty dishes in the sink, pet food scattered across the kitchen floor . . . . [T]he inevitable clutter around her apartment also increases her risk of tripping and falling."

**[4]** The reduction in hours places C.B. at risk of institutionalization. Dr. Mitchell LaPlante, an expert in the demog-

raphy and epidemiology of disability, declared that "[h]aving inadequate levels of help compromises the safety, comfort, and hygiene of individuals requiring help with ADLs and IADLs, reducing their ability to live independently and increasing their risk of institutionalization and death." Dr. LaPlante declared that "[u]nmet needs are especially serious . . . when individuals go unbathed, remain in the same clothing for an extended period, are left in a bed or chair longer than is acceptable, or are unassisted when they need to go to the bathroom or eat. Because these activities involve satisfying primary biological functions [unmet] need cannot be tolerated for long."

**[5]** The reduction in hours, like the risk of institutionalization that the reduction produces, is directly attributable to the emergency regulation, not to C.B.'s deteriorating health. And, as explained above, C.B. was not required to show that the emergency regulation was the exclusive cause of her injury. She need only show that, by depriving her of access to care that is critical to her health, the regulation exacerbates the risk that she will be institutionalized.

### 3.   K.S.

Plaintiff K.S., a 59-year-old woman, suffers from diabetes, congenital glaucoma, macular degeneration, and clinical depression. K.S. participates in Washington's COPES waiver program. She has undergone hip and knee replacements and has very limited mobility. She uses a walker to move about her home and is susceptible to falls. K.S. requires assistance moving, bathing and dressing herself, cooking, managing her medications, using the toilet, and cleaning herself after accidents. If K.S. experiences incontinence while she is left alone, she must sit on the toilet until a provider arrives to help her undress, bathe, and launder her soiled clothes.

Prior to the challenged regulation, K.S. received 133 hours of in-home personal care services per month. The regulation

reduced her authorized monthly hours to 115, a 13.5 percent decrease. To accommodate the reduction in hours, K.S. discontinued weekend care and has "suffered negative physical and mental health consequences." For example, K.S. wears compression stockings because she suffers from edema. K.S. cannot remove her stockings without assistance, so when she is unattended for long periods of time, the skin on her legs becomes dry and itchy and develops sores, putting K.S. at risk of infection. Because K.S. cannot lace her shoes without help, she cannot leave her home on the weekends because it is too dangerous for her to walk in slippers. Consequently, she feels "trapped" in her home and "shut off from the world." K.S. declared that "[i]t is difficult to get all of my cleaning, shopping, food preparation, bathing and hygiene needs done" during the hours authorized. Consequently, K.S. is "worried that I would be unable to remain in my home . . . and I very much want to avoid going to an adult group home. Staying in my home gives me a feeling of independence and I believe my mental health condition would deteriorate in an adult day home quickly. Even though I would be able to get more continuous hours of care at a nursing home, the lack of privacy and the lack of independence that I would experience there would be very difficult for me."

**[6]** In response, DSHS introduced a declaration from McNeill, who stated that it was "unclear" why K.S. did not discuss her concerns about going unattended on the weekends with her case manager. Had she done so, McNeill declared, "[a] Care Plan could have been developed with a daily schedule or a schedule with a shorter gap between care. . . . Recipients and providers often believe that more hours are the only solution to problems, but good care planning and effective case management can often create effective alternatives. DSHS believes that could occur here." The district court relied on McNeill's declaration to find that K.S.'s "apparent failure to contact [her] case manager[ ] about [her] concerns is particularly noteworthy. Rather than giving the State an opportunity to correct any gaps in care, [K.S.] appear[s] to

assume that the reduction will result in harm and that the only alternative to reinstatement of [her] hours is institutionalization."

**[7]** McNeill's declaration ignores the fact that K.S. did contact her case manager to discuss the impact of the hours reduction on her care plan. In a declaration filed before McNeill's, K.S. stated that after learning of the hours reduction, she "informed my case manager . . . that in order to cope with the announced cuts to my home care hours, I had made the decision to let go of my weekend provider." K.S.'s case manager "did not suggest any alternative scheduling arrangements for me to avoid going without weekend care during or any time since that phone call." The district court should not have discounted K.S.'s showing of harm on the ground that she should have revised her care plan with her case manager. K.S. had attempted to do just that, but without success.

### 4.   Summary

**[8]** The detailed evidence introduced to show the adverse impact of the challenged regulation on M.R., C.B., and K.S., as well as the weak responses that DSHS offered to contest that evidence, establish a sufficient likelihood of irreparable injury. Each of the named Plaintiffs has made similar showings of specific ways in which the hours reduction will injure them, but the district court addressed these individualized showings in a generalized fashion.

Our dissenting colleague, Judge Rawlinson, faults us for relying on Plaintiffs' declarations and not adequately deferring to the district court's determination regarding irreparable injury. However, as discussed above, the district court relied on an overly strict causation standard and an erroneous assumption that personal care services did not include medication management, and it did not address the facts of the individual Plaintiffs' cases. Judge Rawlinson implies that the district court discredited the Plaintiffs' declarations because

of their "verbatim or nearly verbatim" recitations of harm. The declarations' similarities in structure and language are offset by the many different, specific details, such as those described above for M.R., C.B., and K.S., about each named Plaintiff.

**[9]** We have several times held that beneficiaries of public assistance "may demonstrate a risk of irreparable injury by showing that enforcement of a proposed rule 'may deny them needed medical care.' " *Indep. Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly*, 572 F.3d 644, 658 (9th Cir. 2009) (quoting *Beltran v. Meyers*, 677 F.2d 1317, 1322 (9th Cir. 1982)), *cert. granted on other issue*, 131 S. Ct. 992 (2011); *see also, e.g.*, *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 596 F.3d 1098, 1113 (9th Cir. 2010), *cert. granted on other issue*, 131 S. Ct. 992 (2011); *Rodde v. Bonta*, 357 F.3d 988, 998-99 (9th Cir. 2004); *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983). District courts in our circuit have reached the same conclusion. *See, e.g.*, *Cota v. Maxwell-Jolly*, 688 F. Supp. 2d 980, 997 (N.D. Cal. 2010) ("[T]he reduction or elimination of public medical benefits is sufficient to establish irreparable harm to those likely to be affected by the program cuts."); *V.L. v. Wagner*, 669 F. Supp. 2d 1106, 1121-22 (N.D. Cal. 2009); *Brantley v. Maxwell-Jolly*, 656 F. Supp. 2d 1161, 1176-77 (N.D. Cal. 2009).

**[10]** In its order, the district court emphasized that "[t]his case does not involve . . . the provision of medical care . . . ; rather this case relates solely to in-home personal care services, which consist of non-medical assistance with activities of daily living." The court reasoned that "[t]he standard articulated in *Beltran* and *Independent Living Ctr.* . . . is not applicable in this case because personal care services are not included within Medicaid's definition of 'medical care.' " But whether personal care services are included in Medicaid's definition is not the critical issue. The critical issue is whether the services are necessary to maintain Plaintiffs' mental or

physical health, and to avoid serious risk of institutionalization.

**[11]** Under Washington law, DSHS may cover the costs to beneficiaries only for services deemed "medically necessary." WASH. ADMIN. CODE § 388-501-0050(4)(d). All payments by DSHS, both before and after the promulgation of the challenged regulation, are therefore payments for "medically necessary" services. "Medically necessary" services are defined as those that are "reasonably calculated to prevent, diagnose, correct, cure, alleviate or prevent worsening of conditions in the client that endanger life, or cause suffering or pain, or result in an illness or infirmity, or threaten to cause or aggravate a handicap, or cause physical deformity or malfunction." *Id.* § 388-501-0005. Plaintiffs have shown that the services they will lose as a result of the challenged regulation — which include assistance in feeding, cleaning, and medicating themselves — relate intimately to their mental and physical health. The loss of these services will exacerbate Plaintiffs' already severe mental and physical difficulties. These predictable consequences will put Plaintiffs at serious risk of institutionalization.[2] We therefore conclude that Plaintiffs have shown a likelihood of irreparable injury.

## B.   Serious Questions Going to the Merits

Plaintiffs argue that the challenged regulation violates the antidiscrimination provisions of the ADA, 42 U.S.C. § 12132, and the Rehabilitation Act, 29 U.S.C. § 794(a). We conclude that Plaintiffs have at least presented serious questions going to the merits of their ADA and Rehabilitation Act claims. Because the applicable provisions of the ADA and the Rehabilitation Act are "co-extensive," we discuss both claims

---

[2]We do not reach Plaintiffs' alternative argument that DSHS's CARE tool measures minimum individual need, such that any departure below hours authorized by the CARE process will necessarily cause irreparable injury.

together, focusing on the ADA. *Sanchez v. Johnson*, 416 F.3d 1051, 1062 & n.6 (9th Cir. 2005).

In enacting the ADA, Congress found that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2). Moreover, Congress found that "discrimination against individuals with disabilities persists in such critical areas as . . . institutionalization," *id.* § 12101(a)(3); and that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, . . . failure to make modifications to existing facilities and practices, . . . [and] . . . segregation," *id.* § 12101(a)(5).

**[12]** In an attempt to remedy society's history of discriminating against the disabled — discrimination that included isolating, institutionalizing, and segregating them — the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id.* § 12132; *accord* 29 U.S.C. § 794(a). The Department of Justice has promulgated regulations implementing the ADA. *See* 42 U.S.C. § 12134(a). One of the regulations is the so-called "integration mandate," providing that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). The "most integrated setting" is the one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." *Id.* Part 35, App. B (2011). The regulation also provides that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would funda-

mentally alter the nature of the service, program, or activity." *Id.* § 35.130(b)(7).

In *Olmstead*, the Supreme Court addressed this statutory and regulatory scheme and reached two conclusions. First, the Court held that "[u]njustified isolation" of disabled persons "is properly regarded as discrimination based on disability." 527 U.S. at 597; *see also Sanchez*, 416 F.3d at 1063 ("In *Olmstead*, the Supreme Court interpreted . . . the ADA as forbidding the arbitrary segregation of the disabled in large state institutions."). Second, however, the Court held that "[t]he State's responsibility, once it provides community-based treatment to qualified persons with disabilities, is not boundless. . . . Sensibly construed, the fundamental-alteration component of the reasonable-modifications regulation would allow the State to show that, in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with . . . disabilities." 527 U.S. at 603-04; *see also Arc of Wash. State*, 427 F.3d at 619 ("[T]he Court recognized certain state justifications that would defeat an ADA-based challenge, for example 'the States' need to maintain a range of facilities for the care and treatment of persons with diverse . . . disabilities, and the States' obligation to administer services with an even hand.' " (quoting *Olmstead*, 527 U.S. at 597)). The Court held that under the ADA, "States are required to provide community-based treatment for persons with . . . disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with . . . disabilities." *Olmstead*, 527 U.S. at 607; *accord id.* at 587.

The district court rejected Plaintiffs' ADA claim on two grounds. The court concluded that to state a violation of the ADA's integration mandate, Plaintiffs were required to show

"that the State's action leaves them no choice but to submit to institutional care to obtain services for which they are otherwise qualified." In the alternative, the court concluded that requiring Washington to maintain in-home personal care services hours at pre-regulation levels "would likely constitute a fundamental alteration of the state's Medicaid program." We take the court's two conclusions in turn.

**[13]** First, the district court erred in stating the legal standard under the integration mandate of the ADA. An ADA plaintiff need not show that institutionalization is "inevitable" or that she has "no choice" but to submit to institutional care in order to state a violation of the integration mandate. Rather, a plaintiff need only show that the challenged state action creates a serious risk of institutionalization. The United States Department of Justice ("DOJ"), the agency that promulgated the regulation containing the integration mandate, 28 C.F.R. § 35.130(d), filed a statement of interest in the district court in which it argued in favor of a preliminary injunction. In its filing, DOJ wrote that "[t]he integration mandate prohibits public entities from pursuing policies that place individuals at risk of unnecessary institutionalization." "[I]mminent risk of institutionalization is not required." Rather, "[t]he elimination of services that have enabled Plaintiffs to remain in the community violates the ADA, regardless of whether it causes them to enter an institution immediately, or whether it causes them to decline in health over time and eventually enter an institution in order to seek necessary care."

**[14]** We afford DOJ's view considerable respect. *Olmstead*, 527 U.S. at 597-98 ("Because the Department is the agency directed by Congress to issue regulations implementing Title II [of the ADA], its views warrant respect."). We also defer to an agency's reasonable interpretation of its own statutorily authorized regulation. *Barrientos v. 1801-1825 Morton LLC*, 583 F.3d 1197, 1214 (9th Cir. 2009) (citing *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 395, 397 (2008)). An agency's interpretation of its own regulation is "control-

ling unless plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (internal quotation marks omitted); *Barboza v. Cal. Ass'n of Prof'l Firefighters*, 650 F.3d 1073, 1079 (9th Cir. 2011) ("[U]nless an alternative reading is compelled by the regulation's plain language or by other indications of [the agency's] intent at the time of the regulation's promulgation, deference is required." (internal quotation marks and citation omitted)).

The district court discounted DOJ's interpretation of the integration mandate as "a self-serving agency interpretation taken solely in the context of ongoing litigation." In *Auer*, the Supreme Court rejected the argument that an agency position taken in an amicus brief was unworthy of deference:

> [T]hat the Secretary's interpretation comes to us in the form of a legal brief . . . does not, in the circumstances of this case, make it unworthy of deference. The Secretary's position is in no sense a *post hoc* rationalization advanced by an agency seeking to defend past agency action against attack. There is simply no reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question.

519 U.S. at 462 (internal quotation marks and citation omitted); *accord Holowecki*, 552 U.S. at 397 (deferring to agency's interpretation of a regulation in an amicus brief); *Barrientos*, 583 F.3d at 1214 (same). The circumstances in this case are similar to those in *Auer*. DOJ is not a party and is not "seeking to defend past agency action against attack." Its "statement of interest" in the district court under 28 U.S.C. § 517 is comparable to an amicus brief because of its interest in ensuring a proper interpretation and application of the integration mandate. Further, we note that DOJ's interpretation of the integration mandate in this case is consistent with its interpretation in another case before this court. The district court, and our dissenting colleague, overlook the Supreme Court's

direction about how to treat agency interpretations in such instances.

DOJ's interpretation is not only reasonable; it also better effectuates the purpose of the ADA "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(2). Institutionalization sometimes proves irreversible. Dr. Gardner, Plaintiffs' expert on habilitative mental health care, declared that "[i]nstitutionalization . . . creates an unnecessary clinical risk that the individual will become so habituated to, and so reliant upon, the programmatic and treatment structures that are found in an inpatient setting that his or her ability to function in less structured, less restrictive, environments may become severely compromised." In recognition of this clinical reality, the cases accord with DOJ's interpretation. *See, e.g.*, *V.L.*, 669 F. Supp. 2d at 1119 ("[P]laintiffs who currently reside in community settings may assert ADA integration claims to challenge state actions that give rise to a risk of unnecessary institutionalization."); *Brantley*, 656 F. Supp. 2d at 1170-71 ("[T]he *risk* of institutionalization is sufficient to demonstrate a violation of [the ADA]."); *see also, e.g.*, *Fisher v. Okla. Health Care Auth*, 335 F.3d 1175, 1182 (10th Cir. 2003) ("*Olmstead* does not imply that disabled persons who, by reason of a change in state policy, stand imperiled with segregation, may not bring a challenge to that state policy under the ADA's integration regulation without first submitting to institutionalization.").

The district court's second ground for rejecting Plaintiffs' ADA claim was that requiring DSHS to maintain preregulation levels of personal care services hours would likely constitute a fundamental alteration of the state's Medicaid plan. We have not previously decided whether a state may assert a fundamental alteration defense where, as here, the state opposes an injunction that would preserve a preexisting program that complies with the ADA. The text of the regulation suggests that the defense is available only to excuse pro-

spective modifications to programs. *See* 28 C.F.R. § 35.130(b)(7) ("A public entity shall make reasonable modifications in policies, practices, or procedures . . . unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."). Here, Plaintiffs argue that they are seeking to preserve the status quo and prevent modifications to the state's preexisting program. The Tenth Circuit rejected a fundamental alteration defense in similar circumstances, observing, "[n]or is it clear why the preservation of a program as it has existed for years and as approved by the federal government would fundamentally alter the nature of the program." *Fisher*, 335 F.3d at 1183 (internal quotation marks omitted). However, we need not decide whether the fundamental alteration defense applies in these circumstances because, even if it does, Plaintiffs have at least raised a serious question on the merits about the validity of the defense on the facts.

**[15]** When evaluating a fundamental alteration defense, a court must consider "not only the cost of providing community-based care to the litigants, but also the range of services the State provides others with mental disabilities, and the State's obligation to mete out those services equitably." *Olmstead*, 527 U.S. at 597. That is, the ADA requires home or community-based placement of disabled persons only if "the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with . . . disabilities." *Id.* at 607; *see also* 28 C.F.R. § 35.130(b)(7); *Sanchez*, 416 F.3d at 1067-68; *Arc of Wash. State*, 427 F.3d at 618-19. But budgetary concerns do not alone sustain a fundamental alteration defense. *See Fisher*, 335 F.3d at 1181 ("If every alteration in a program or service that required the outlay of funds were tantamount to a fundamental alteration, the ADA's integration mandate would be hollow indeed."); *see also, e.g.*, *Townsend*, 328 F.3d at 520 ("[E]ven if extension of community-based long term care services to the medically needy were to generate greater expenses for the state's Medicaid program, it is unclear

whether these extra costs would, in fact, compel cutbacks in services to other Medicaid recipients."); *Pa. Prot. & Advocacy, Inc. v. Pa. Dep't of Pub. Welfare*, 402 F.3d 374, 380 (3d Cir. 2005); *Radaszewski v. Maram*, 383 F.3d 599, 614 (7th Cir. 2004); *Frederick L.*, 364 F.3d at 495-96; *Cota*, 688 F. Supp. 2d at 995. DSHS must show how "fund-shifting . . . would disadvantage other segments of the . . . disabled population." *Frederick L.*, 364 F.3d at 497; *see Townsend*, 328 F.3d at 520.

**[16]** At this point in the litigation, it is highly speculative that preliminary injunctive relief for Plaintiffs will compromise care for the rest of Washington's disabled community to such an extent that Washington's Medicaid program would be fundamentally altered. Dreyfus, DSHS's director, filed a declaration in the district court stating that if an injunction were granted the agency "would need to eliminate the Optional State Plan Service of Medicaid Personal Care and put a limit on the number of recipients . . . served under the Long Term Care [42 U.S.C. § 1396n(c)] waivers including COPES and New Freedom." It is difficult to assess Dreyfus's dire predictions and to determine, even if they are borne out, whether they would constitute a fundamental alteration. Washington's legislature has mandated that the state Medicaid plan include the provision of personal care services for the categorically needy, and DSHS has touted COPES as the centerpiece of the legislatively mandated commitment to deinstitutionalization. WASH. REV. CODE § 74.09.520(2). In its briefs, DSHS did not identify specific programs that would necessarily be cut if all or part of the challenged regulation were preliminarily enjoined, nor was counsel able to identify such programs at oral argument. Indeed, DSHS counsel was unable to say with certainty whether the cuts would necessarily come from the Medicaid program, or whether cuts could be made to some other portion of Washington's budget if Plaintiffs were to prevail in this litigation. *See Townsend*, 328 F.3d at 520 (to make out fundamental alteration defense, state must show that the "provision of community-based services to medically needy

disabled Washingtonians might fundamentally alter its *Medicaid programs*" (emphasis added)). The state must make a more particularized showing of harm to others in the disabled community in order to eliminate serious questions on the merits concerning the validity of the fundamental alteration defense. *See Frederick L.*, 364 F.3d at 497; *Townsend*, 328 F.3d at 520.

## C. Balance of Hardships

**[17]** We conclude that the balance of hardships tips sharply in favor of Plaintiffs. As discussed above, the record in this case establishes that the named Plaintiffs suffer severe hardship, made still more severe by the challenged regulation, resulting in a serious risk of institutionalization in violation of the ADA and the Rehabilitation Act. Set against Plaintiffs' hardship are diffuse and nonspecific hardships asserted by the State. It is clear that money spent on behalf of the Plaintiffs is money that will not be spent on other programs. But it is not clear from the evidence in the record or from the arguments made to us precisely what those other programs are and the extent to which they would be cut. *See, e.g.*, *Harris*, 366 F.3d at 766 ("The County suggests that the injunction forces it to cut other important programs . . . . But whether any or all of those programs will actually be impacted by the court's injunction is much more speculative than the probable injury the chronically ill plaintiffs face absent preliminary injunctive relief.").

Nor is it clear that the state, on balance, will save money by cutting the services at issue in this case, given the cost to the state of institutionalizing Plaintiffs. We have several times held that the balance of hardships favors beneficiaries of public assistance who may be forced to do without needed medical services over a state concerned with conserving scarce resources. *See, e.g.*, *Indep. Living Ctr.*, 572 F.3d at 659 ("State budgetary considerations do not therefore, in social welfare cases, constitute a critical public interest that would

be injured by the grant of preliminary relief."). The balance of hardships favors plaintiffs challenging cuts to state programs "in light of evidence in the record that suggests that [the action sought to be enjoined] may have an adverse, rather than beneficial, effect on the State's budget, such that it would actually save the State money if it maintained [the status quo]." *Dominguez v. Schwarzenegger*, 596 F.3d 1087, 1098 (9th Cir. 2010); *see also Rodde*, 357 F.3d at 999-1000. Plaintiffs have advanced such evidence in this case by showing that if program beneficiaries currently treated in their homes transition to more costly institutional care, the state will not realize its anticipated cost savings.

### D.   Public Interest

The Washington legislature has expressly found that "the public interest would best be served by a broad array of long-term care services that support persons who need such services at home or in the community whenever practicable and that promote individual autonomy, dignity, and choice." WASH. REV. CODE § 74.39A.005. "[T]here is a robust public interest in safeguarding access to health care for those eligible for Medicaid, whom Congress has recognized as 'the most needy in the country.' " *Indep. Living Ctr.*, 572 F.3d at 659 (quoting *Schweiker v. Hogan*, 457 U.S. 569, 590 (1982)); *see also Cal. Pharmacists Ass'n*, 596 F.3d at 1114-15 (rejecting the argument that the public interest required that the legislature be able to "exercise its considered judgment in a manner that serves the best interests of both [Medicaid] recipients and the State as a whole," despite the state's argument that "injunctions against payment reductions have forced the State to eliminate many optional [Medicaid] services").

**[18]** We recognize that a preliminary injunction is an "extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. But given the likelihood of irreparable harm to Plaintiffs, the serious questions on the merits raised by their suit, the balance of hardships that tips sharply in their favor,

and the statutorily declared policy of the state in favor of the services they seek to preserve, we conclude that the public interest is served by preserving the status quo by means of a preliminary injunction. *See Rodde*, 357 F.3d at 999 n.14 (that Plaintiffs seek "to preserve, rather than alter, the status quo while they litigate the merits of this action also strengthens their position").

### E.   Scope of the Injunction

**[19]** Our conclusion with respect to irreparable injury and risk of institutionalization is limited to the named Plaintiffs. We have stated that "[s]ystem-wide [injunctive] relief is required if the injury is the result of violations of a statute . . . that are attributable to policies or practices pervading the whole system (even though injuring a relatively small number of plaintiffs), or if the unlawful policies or practices affect such a broad range of plaintiffs that an overhaul of the system is the only feasible manner in which to address the class's injury." *Armstrong v. Davis*, 275 F.3d 849, 870 (9th Cir. 2001). The challenged regulation likely establishes such a policy for a system of care. But *Armstrong* involved a certified class. Subject to exceptions not applicable here, "[w]ithout a properly certified class, a court cannot grant relief on a class-wide basis." *Zepeda v. INS*, 753 F.2d 719, 728 n.1 (9th Cir. 1984). At the time we reviewed this appeal, the district court had yet to rule on Plaintiffs' motion for class certification. We conclude that the regulation must be preliminarily enjoined as to the named Plaintiffs. We leave it to the district court to determine on remand whether, in light of this opinion, broader preliminary injunctive relief is appropriate.

### Conclusion

The named Plaintiffs have shown a likelihood of irreparable injury because the regulation puts them at serious risk of institutionalization. For the same reason, they have raised a serious question going to the merits of their ADA/

Rehabilitation Act claim. They have also raised a serious question on the merits about the validity of the fundamental alteration defense. The balance of hardships tips sharply in Plaintiffs' favor, and the public interest favors a preliminary injunction. We therefore reverse and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

---

RAWLINSON, Circuit Judge, dissenting:

I respectfully dissent from the majority opinion in this case. It is important to note at the outset that this appeal challenges the denial of a preliminary injunction. Our review is for an abuse of the considerable discretion afforded the district court in making the determination whether a preliminary injunction should be entered. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). So long as the district court "got the law right," we "will not reverse the district court." *Id.* (citation omitted). Our scope of review is necessarily limited. *See Sports Form, Inc. v. UPI, Inc.*, 686 F.2d 750, 752 (9th Cir. 1982).

In a thoughtful and comprehensive 50-page order, the district court denied the request for a preliminary injunction. As the majority acknowledges, any factual findings made by the district court must be accepted unless clearly erroneous. *See Alliance for the Wild Rockies*, 632 F.3d at 1131. The district court prefaced its decision by noting its "careful" review" of the 164+ documents filed by the parties and the 5+ hours of oral argument during two hearings. *See District Court Order*, p. 2 n.4. The district court also recognized that a preliminary injunction is an "extraordinary interlocutory remedy" that should be the exception rather than the rule. *See id.* at p. 3 (quoting *Winter v. Natural Res. Defense Counsel Inc.*, 129 S. Ct. 365, 376 (2008)).

The district court found that not one of the named plaintiffs satisfied the criteria to be placed in the classification reflecting the highest acuity of need. *See id.* at p. 10. Keeping in mind that the services at issue are personal care services, and not medical care, the district court determined that the plaintiffs failed to establish a likelihood of irreparable harm. *See id.* at p. 12 & n.13. The district court relied largely on its determination that the threatened injury (institutionalization) was not imminent. *See id.* at p. 13 n.14 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983)). The district court emphasized that this factor was particularly important where a party seeks to enjoin official action on the part of a State. *See id.* (noting federalism concern).

The district court underscored the fact that Washington's assessment mechanism did not reflect the individual need of each program participant. Rather, the assessment reflected the relative acuity of the need for personal care services. *See id.* at p. 14. The assessment essentially determined what share of the available resources a program participant should be allocated. *See id.* at p. 15. Because the assessment does not translate into a number of absolute hours of required personal services, the district court concluded that plaintiffs could not persuasively argue that a decrease in the number of personal care services hours resulted in the required showing that institutionalization was imminent. Indeed, the district court found to the contrary. *See id.* at p. 17 n.20 (referring to evidence in the record that the 2009 reduction in personal care services hours "*did not* result in any negative consequences to personal care service beneficiaries . . . .") (emphasis in the original). Specifically, program participants were not institutionalized due to the decrease in personal care service hours. *See id.*; *see also id.* at p. 18 (explaining that since the 2011 reductions went into effect, "over 99% of the sampled records reflected no complaint concerning the adequacy of allotted hours").

I recognize that my colleagues in the majority rely on the declarations from the plaintiffs to support their reversal of the

district court's decision. However, without a showing of clear error on the part of the district court judge, it is not enough to simply credit one party's view of the evidence. Actually, Supreme Court precedent dictates exactly the opposite approach. Where there are two views of the evidence presented, and the trier of fact selects one view over the other, no clear error can be shown. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.") (citations omitted).

In this case, the plaintiffs presented declarations averring that institutionalization was likely if the personal service hours were decreased. The State defendants presented declarations refuting those submitted by the plaintiffs. At this stage of the proceedings and considering our limited standard of review, I am not persuaded that the district court clearly erred in crediting the State's view of the facts.[1]

Ultimately, the district court determined that the plaintiffs' declarations failed to make an adequate showing of a likely threat of harm because the declarations

> (1) ascribe the threat of institutionalization to plaintiffs' deteriorating medical conditions, unrelated to the provision of personal care service hours; (2) demonstrate ineffective management of currently allocated personal care service hours; or (3) identify non-personal care services as the cause of their predicted institutionalization.

*Id.* at p. 24.[2]

---

[1] It is of some interest that the district court noticed that the plaintiffs' declarations of harm were "repeated verbatim or nearly verbatim throughout the various declarations . . ." *Id.* at p. 24 n.30.

[2] The district court also noted the use of qualifying language in the declarations that rendered them "speculative at best . . ." *Id.* at p. 25 n.31.

The district court described nine plaintiffs whose medical conditions worsened without regard to the decrease in personal care service hours. *See id.* at pp. 24-25. The district court also credited evidence from the State defendants regarding "[i]nefficient [u]se of [c]urrently [a]llocated [p]ersonal [c]are [s]ervice [h]ours[,]" *Id.* at pp. 26-27, and the inclusion of non-personal care services in the asserted harm arguments, *see id.* at pp. 27-28.

Considering the district court's determination regarding the likelihood of irreparable harm with the required deference to its factual findings, I am not persuaded that we should reverse the district court's determination.

In my view, a similar conclusion is in order upon review of the district court's resolution of plaintiffs' claim predicated on the provisions of the Americans With Disabilities Act (ADA). The thrust of plaintiffs' argument is that the mandated decrease in personal care services hours violates the ADA requirement that disabled individuals be integrated into the community for services rather than be institutionalized to receive services. According to plaintiffs, the decrease in personal care services hours will result in institutionalization of individuals who could remain in the community if the personal care services hours were maintained at their previous levels. The majority agrees with the plaintiffs' contention, describing this issue as a serious question going to the merits of plaintiffs' ADA claims.

The Supreme Court addressed the ADA's integration provision in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999). In that case, mental patients were retained in institutional facilities after medical providers concluded that treatment in community-based facilities was appropriate. *See id.* at 593. The Court held that the ADA required placement in a community-based facility if "the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with . . . disabilities . . . ."

*Id.* at 587. The Court fully acknowledged that the State had multiple and diverse obligations to its disabled citizens and a concomitant obligation to administer all its services "with an even hand . . . ." *Id.* at 597. The Court explained that the State's obligation to provide a variety of services evenly for all program participants mandated that more leeway be afforded the States in administering those programs. *See id.* at 605.

Given the leeway that the Supreme Court has instructed *must* be afforded the States in administering social services programs, the question of whether plaintiffs have raised a serious issue going to the merits is not as cut-and-dried as the majority portrays.

The majority urges "considerable respect" to the Department of Justice's bald statement that "the elimination of services that have enabled Plaintiffs to remain in the community violates the ADA, regardless of whether it causes them to enter an institution immediately, or whether it causes them to decline in health over time and eventually enter an institution in order to seek necessary care." *Majority Opinion*, pp. 21140-41 (quoting the statement of interest filed by the DOJ). However, the district court was not persuaded that the DOJ's bald statement was entitled to deference. *See District Court Order*, p. 39 n.42.

The Supreme Court in *Olmstead* stopped short of requiring that deference be given to the DOJ's view. Rather, the Supreme Court stated:

> We need not inquire whether the degree of deference described in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.* . . . is in order: [i]t is enough to observe that the *well-reasoned views* of the agencies implementing a statute constitute a body of experience and informed judgment to which courts and litigants *may* properly *resort* for guidance.

*Olmstead*, 527 U.S. at 598 (citation, alteration and internal quotation marks omitted) (emphasis added).

The fact that the district court elected not to defer to the DOJ's bald, unreasoned statement did not run afoul of the Supreme Court's permissive view of the deference owed to the DOJ's interpretation of the integration regulation.

Because I conclude that the plaintiffs have not raised serious questions going to the merits of their claim, and because the district court committed no clear error in finding a lack of irreparable harm, I would affirm the district court's denial of injunctive relief on those bases. However, I also note that *Olmstead* contains language supporting the district court's determination that granting the relief requested by Plaintiffs would likely constitute a fundamental alteration of the State's plan. *See Olmstead*, 527 U.S. at 597 ("In evaluating a State's fundamental-alteration defense, the District Court must consider, in view of the resources available to the State, not only the cost of providing community-based care to the litigants, but also the range of services the State provides others with . . . disabilities, and the State's obligation to mete out those services equitably."). This same rationale supports the district court's determination that the public interest favors permitting the State to equitably balance the needs of all persons who are served by the Medicaid program rather than requiring the State to accommodate the needs of a discrete subset of that population at the expense of others in need.

Keeping in mind our limited scope of review and the deference owed to the district court's factual findings, I do not agree that the district court abused its discretion when it denied the requested preliminary injunction. Therefore, I respectfully dissent from the majority opinion.